**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **JASON WILLIAMS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 02-1177-GPM-PMF** |
| | ) | |
| **DONALD SNYDER, JR., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**REPORT AND RECOMMENDATION**

**FRAZIER, Magistrate Judge:**

Before the Court is defendants' motion for summary judgment (Doc. No. 146). The motion is opposed (Doc. No. 154, 155). In this § 1983 action for damages, plaintiff challenges the conditions of his confinement at Menard Correctional Center. Following remand, these claims remain for decision:

Count I - First Amendment retaliation claims against defendants Summers, Meyer, Pickering, Maue, Jines, and Gales

Count II - First Amendment religious freedom claims and Religious Land Use and Institutionalized Persons Act (RLUIPA) claims against defendants Biggs, Colvis, Garret, Gales, Grubman, Maue, Mitchell, Spiller, Welborn, and Wilson.

Count III - Administrator liability claims against defendants Snyder, Clark, Cowan, Knop, Walls, Lambert, Frentzel, Maue, Spiller, and Grubman.

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To determine whether

there is a genuine issue of material fact, courts construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The facts, viewed in plaintiff's favor, are summarized as follows. In early 2000, plaintiff became a sincere follower of Rastafarian religious and cultural beliefs. He exercises those beliefs by allowing his hair to grow naturally in a hairstyle known as dreadlocks. In a prison setting, dreadlocks present legitimate security concerns. As the hair grows and locks, it becomes thick and matted, serving as a potential place to conceal small items of contraband, including dangerous items such as a shard of glass or a needle. A visual search of dreadlocks is not an effective method to detect contraband and thereby ensure the safety of other inmates and staff. A search with a metal detector is only partially effective; and a thorough manual search by correctional officers presents a significant risk of harm to the individual who performs the search.

Between November, 2000, and January, 2003, grooming policies were adopted at Menard Correctional Center. Defendants Walls, Cowan, and Snyder were involved in formulating those policies, which generally provide that inmates who wear their hair in a style that prevents a thorough search must make their hair accessible to a search. Failure to comply with a direct order to do so (by voluntarily removing braids or cutting dreadlocks) results in disciplinary action and segregated confinement. If noncompliance continues, the hair will be clipped by a staff barber.[1]

At times, the grooming policies were not enforced or were not enforced in a uniform manner.

[1] Defendants suggest that the grooming policy did not include forced haircuts until February 1, 2002. This position is not supported by the materials on file, which show that forced haircuts were mandated in November, 2000 (Doc. No. 146-2 pp. 10-11).

Prior to April, 2001, plaintiff exercised his sincere Rastafarian beliefs by wearing his hair in dreadlocks. For a considerable period of time, he wore dreadlocks without being disciplined or confined to the segregation unit. During that time, he lived with other inmates in the general prison population, took showers, obtained medical treatment, visited the exercise yard, and worked in the segregation unit as a janitor. On April 9, 2001, plaintiff filed a grievance against defendant Summers. On April 13, 2001, plaintiff filed a grievance against defendant Meyer. In the grievances, plaintiff complained about the conditions of his confinement.

Beginning on April 25, 2001, and continuing until November, 2002, plaintiff was accused of failing to comply with the prison's grooming policy and/or disobeying direct orders to change his hair style. He was transferred to the segregation unit on April 25, 2001. Defendant Jines wrote the April 25, 2001, disciplinary report. Defendant Jines knew defendant Meyer very well and considered him a friend. Defendant Colvis wrote additional disciplinary reports on May 25 and June 2, 2001. Various adjustment committees heard the disciplinary charges and imposed sanctions, including terms of segregated confinement, reduced grade status, and loss of yard or commissary privileges. On occasion, good conduct credits were also revoked. During this time, other inmates grew their hair in dreadlocks and received less severe treatment. Plaintiff continued to write grievances, and the disciplinary actions continued as well.

While plaintiff was confined in the segregation unit, he had access to a Bible for a period of time. At times, he was able to adhere to a religious diet. Barber services were offered and declined. Under normal circumstances, an inmate confined to the segregation unit may leave the unit while escorted by a correctional officer with the hands restrained behind the back. Segregation inmates

are observed while taking showers and may normally receive routine medical attention while restrained or while in their cells. Because plaintiff refused to voluntarily remove his dreadlocks, he faced additional restrictions on his movement. He was not allowed to leave the segregation unit to visit other parts of the prison, except on rare occasions. Although plaintiff suffered from a variety of medical ailments, he was not allowed to leave the segregation unit in order to keep medical appointments. Also, he was not allowed to attend the disciplinary hearings held by adjustment committees. He missed opportunities to shower and visit the exercise yard.

On two occasions, plaintiff was temporarily transferred to Stateville Correctional Center. At that facility, plaintiff wore dreadlocks without repercussions.

Plaintiff prepared this litigation in mid-November, 2002. At about the same time, defendant Spiller warned plaintiff that his dreadlocks could be cut against his will. Plaintiff filed his litigation on November 15, 2002. On November 27, 2002, members of the institution's tactical team escorted plaintiff to an area where a barber used clippers to remove plaintiff's dreadlocks. Plaintiff offered no resistence, yet some degree of force was used. After the dreadlocks were removed, plaintiff remained confined in the segregation unit, although his hair style no longer presented a security concern.

Prison officials faced with the task of framing an appropriate response to the security concerns presented by dreadlocks have various options available to them. One option is for a correctional officer to observe the inmate run his fingers through the dreadlocks until the officer is satisfied that contraband is not hidden in the hair. Another option is for a correctional officer to perform a manual search of the inmate's dreadlocks. Another option is for a correctional officer to search the dreadlocks using a wand-type metal detector. Another option is for a correctional officer

to give an order directing the inmate to change his hairstyle, provide barber services, and initiate disciplinary proceedings if the inmate refuses to obey the order. Another option is for the prison barber to remove the dreadlocks with clippers, using force if the inmate resists.

## I. Retaliation

Defendants Summers, Meyer, Pickering, Maue, Jines, and Gales seek judgment in their favor on plaintiff's retaliation claim, suggesting that plaintiff tendered insufficient evidence to support a finding that events would have transpired differently absent their retaliatory motive. Plaintiff contends that the chronology of events would support a finding that these defendants retaliated for his protected conduct of filing grievances.

An act performed in retaliation for the exercise of a constitutionally protected right will subject the actor to liability even where the act, if taken for a different reason, would have been proper. *Buise v. Hudkins*, 584 F.2d 223, 229 (7th Cir. 1978). A claim of retaliation succeeds upon proof that constitutionally protected conduct was a motivating factor for the defendant's offensive behavior. *Babcock v. White*, 102 F.3d 267, 275 (7th Cir. 1996); *McDonald v. Hall*, 610 F.2d 16, 18-19 (1st Cir. 1979). The materials on file would reasonably support an inference that defendants Jines and Meyer were motivated to initiate disciplinary action because plaintiff used the prison grievance process.

In support of their argument, defendants Summers, Meyer, Pickering, Maue, Jines, and Gales rely on cases such as *Babcock*, where the Court found that summary judgment was inappropriate but also recognized that the retaliation claim would not succeed if the *defendant* showed that events would not have transpired differently absent the retaliatory motive. This argument appears to rest largely on speculation. On summary judgment, the Court will decline to draw the inference that

defendant Jines would have initiated disciplinary charges in the absence of plaintiff's grievances.

The evidence discussed in the briefs does not reveal a genuine issue for trial as to the retaliation claim asserted against defendants Pickering, Maue, or Gales. In particular, plaintiff points to no evidence showing that these defendants engaged in retaliatory conduct. Hence, this aspect of defendants' motion should be granted in part. On the retaliation claim, summary judgment should be entered in favor of defendants Pickering, Maue, and Gales. Fed. R. Civ. P. 56(e).

## II. Qualified Immunity – Religion claims

Defendants Biggs, Colvis, Cowan, Frentzel, Garret, Gales, Grubman, Knop, Lambert, Maue, Mitchell, Snyder, Spiller, Walls, and Welborn seek judgment in their favor on their affirmative defense of qualified immunity. This argument is construed as seeking judgment in favor of these defendants only on the First Amendment free exercise and RLUIPA claims. Plaintiff maintains that the qualified immunity defense does not apply to his claims because the claims are based on events showing intentional misconduct.

In order to resolve a qualified immunity defense, the Court first decides whether the conduct violated a statutory or Constitutional right, taking the facts in the light most favorable to plaintiff. If so, the Court considers whether the right was clearly established in the light of the specific context of the case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

It is well established that prisoners have the right to freely exercise their religious beliefs. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348(1987). However, a prisoner's right to freely exercise his religious beliefs does not depend on his ability to pursue each and every aspect of a preferred religious practice. Rather, "[a] prison may restrict a prisoner's ability to adhere absolutely

to a particular tenet of his religion, and if the prison has sound penological interests supporting the restriction and, if those interests outweigh the prisoner's religious interests, the restriction does not violate the First Amendment. *Canedy v. Boardman*, 91 F.3d 30, 33 (7th Cir.1996) *citing O'Lone*, 482 U.S. at 352.

Construing the evidence in plaintiff's favor, he may be able to prove that the defendants exaggerated their response to the legitimate security concerns presented by his religious hairstyle, such that their conduct was not reasonably related to the prison's legitimate security interest in conducting a thorough search of inmates. However, a number of courts have held that similar grooming policies satisfy the *Turner* criteria. Considering the state of the law and the substantial deference due prison officials who make difficult prison management decisions, the law was not clearly established in plaintiff's favor during the relevant time period. *See Hamilton v. Schriro*, 74 F.3d 1545, (8th Cir. 1996)(hair length regulation survived Constitutional and statutory challenges); *Williams v. Wade*, 354 F.Supp.2d 894, 898 (W.D. Wisc. 2005)(allowing forced removal of dreadlocks claim to proceed while finding that the claim had little chance of success); *Diaz v. Collins*, 114 F.3d 69, (5th Cir. 1997)(prison regulation on hair length did not violate the First Amendment or the RFRA). When these defendants responded to plaintiff's violation of the grooming policy by imposing discipline and severely restricting his movements, they would not have known that their conduct violated his First Amendment free exercise rights. Their qualified immunity defense has merit.

With respect to the Religious Land Use and Institutionalized Persons Act (RLUIPA) claim, plaintiff has proof that the defendants created a substantial burden on his exercise of sincere

Rastafarian religious beliefs. The burden shifts to the defendants to show that the restriction furthers a compelling state interest by the least restrictive means. 42 U.S.C. § 2000cc-1(a); *Charles v. Verhagen*, 348 F.3d 601 (7th Cir. 2003). On this point, the defendants have proved that their goal of maintaining prison security by conducting thorough searches of inmate hair is a compelling state interest.

Hence, the claim turns on whether the defendants furthered their goal of maintaining prison security by the least restrictive means. This question generally entails an exploration of available alternatives, with some measure of explanation as to why the selected method is the least restrictive alternative.

The defendants take the position that the only reasonable way to meet the prison's safety and security concerns is to confine inmates with dreadlocks to the segregation unit and severely restrict their out-of-cell movements (Doc. No. 146, p. 12; Doc. No. 146-2, p. 3; ). That conclusion is based on the rational rejection of only one possible alternative: requiring a correctional officer to conduct a manual search of the dreadlocks. However, it is clear from the evidence that a variety of alternative are available when an inmate wears his hair in dreadlocks. The Court should decline to accept segregation with restricted movement as the least restrictive alternative where there is no evidence that other plausibly effective alternatives have been considered and rejected for valid reasons. Disciplinary charges with sanctions of increasing severity might have the effect of persuading the inmate to voluntarily change his hairstyle. Another option is to impose disciplinary segregation as a sanction while permitting movement to other parts of the facility in the usual manner: with a correctional officer escort and with the inmate's hands restrained behind his back. Another option is to impose the sanction of disciplinary segregation and permit movement to other parts of the prison after the inmate has been searched using metal-detecting equipment and also

instructed to run his fingers through his hair until the searching officer is satisfied that dangerous contraband has not been hidden in the dreadlocks. Alternatively, disciplinary segregation might be imposed with some restricted movement while permitting the inmate to receive routine medical attention at his cell while his hands are restrained behind his back. By identifying the segregation with restricted movement option as the least restrictive alternative, the defendants seem to admit that the appropriate standard was exceeded when plaintiff's hair was clipped by the barber. In short, the Court finds that plaintiff can prove that his statutory rights were violated.

Turning to the qualified immunity defense, the Court finds that plaintiff's statutory rights under RLUIPA were not clearly established in the specific context of this case in 2001 and 2002. Plaintiff has not relied on, and the Court is not aware of, cases awarding RLUIPA or RFRA relief against a correctional official based on enforcement of a similar hair grooming policy.[2] Plaintiff maintains that the qualified immunity defense should be rejected on the basis that the statutory violation was intentional and purposeful. *See Lovelace v. Lee*, 472 F.3d 174, 199 (4th Cir. 2006). These cases are not instructive in this context. Unlike the inmate who has a clearly established right to a religious diet, plaintiff had no clearly established right to grow his hair into dreadlocks. *See May v. Baldwin*, 109 F.3d 557, 561 (9th Cir. 1997)(granting qualified immunity on statutory hair grooming claim).

## III. Administrator's Liability

Defendants Snyder, Cowan, Knop, Walls, Lambert, Frentzel, Maue, Spiller, and Grubman

[2] Plaintiff relies on recent cases: *Nelson v. Miller*, No. 03-254-CJP, 2007 WL 2746856 (S.D. Ill Sept. 20, 2007), a religious diet case, and *Collins-Bey v. Thomas*, No. 03-2779, 2004 WL 2381874 (N.D. Ill Oct. 25, 2004), where the particular argument advanced was unsupported by evidence.

seek judgment in their favor on the administrator's liability claim. They argue that their grooming policies apply to all staff and inmates regardless of race, religion, or culture. Plaintiff responds that the grooming policies were not enforced with uniformity.

Plaintiff's claims against the administrators are based on allegations that they failed to take appropriate action despite their awareness that his rights were being violated and refused to answer grievances in order to prevent him from exhausting administrative remedies (Doc. No. 39). Because the argument advanced by these defendants is not responsive to the claim and is unsupported by a discussion of the applicable legal standard, it is rejected as grounds for summary judgment.

## IV. Claims against defendant Clark

The materials on file show that defendant Clark could not be served, despite an extension of the service deadline and reasonable efforts by the United States Marshals Service to locate this defendant (Doc. Nos. 67, 93, 97, 120). Plaintiff's claims against defendant Clark should be dismissed without prejudice for lack of service of process at this time. Fed. R. Civ. P. 4(m).

## V. Conclusion

IT IS RECOMMENDED that defendants' motion for summary judgment (Doc. No. 146) be GRANTED in part and DENIED in part, as follows:

(1). At the close of this case, judgment should enter in favor of defendants Pickering, Maue, and Gales on plaintiff's First Amendment retaliation claim.

(2). At the close of this case, judgment should enter in favor of defendants Biggs, Colvis, Cowan, Frentzel, Garret, Gales, Grubman, Knop, Lambert, Maue, Mitchell, Snyder, Spiller, Walls, and Welborn on plaintiff's First Amendment free exercise of religion and Religious Land Use of Institutionalized Persons Act claims.

(3). Plaintiff's claims against defendant Clark should be dismissed without prejudice.

If this recommendation is adopted, retaliation claims will remain against defendants Meyer,

Jines, and Summers and administrator liability claims will remain against defendants Snyder, Cowan, Knop, Walls, Lambert, Frentzel, Maue, Spiller, and Grubman.

**SUBMITTED: October 4, 2007 .**

***s/ Philip M. Frazier***
**PHILIP M. FRAZIER**
**UNITED STATES MAGISTRATE JUDGE**